IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GEMALTO PTE LTD., et al.,        )
                                 )
        Plaintiffs,              )
                                 )
v.                               )        1:08cv776 (LMB/TRJ)
                                 )
TELECOMMUNICATIONS INDUSTRY      )
ASSOCIATION,                     )
                                 )
        Defendant.               )

## MEMORANDUM OPINION

This civil action arises out of a dispute between two telecommunications companies and a telecommunications trade organization, over the trade organization's administration and management of User Identification Module IDs ("UIM_IDs"). Defendant Telecommunications Industry Association ("TIA") has moved for summary judgment on all counts of the Amended Complaint, and plaintiffs Gemalto Pte Ltd. and Gemplus S.A., have moved for partial summary judgment on elements of three counts of the Amended Complaint. This Memorandum Opinion explains the reasons for granting both motions in part and denying both motions in part.[1]

## I.   Background

Plaintiffs Gemalto Pte Ltd. and Gemplus S.A. are sister corporations and are Singapore and France-based subsidiaries of

---

[1] Because of the impending trial date, the Order announcing the decision was issued several days before this Opinion.

Gemalto N.V., which was formed after the June 2006 merger of Gemplus International S.A. and Axalto N.V. Gemalto Pte Ltd., Gemplus S.A., and Gemalto N.V., are all separate legal entities, and neither Gemalto N.V. nor any of its other subsidiaries are parties to this litigation. During the time period relevant to this litigation, Gemalto Pte Ltd. served as the Asian headquarters for the Gemalto telecom business. As such, Gemalto Pte Ltd. managed sales to Asian customers, although another subsidiary might actually make the sale to the Asian customer. At that time, plaintiff Gemplus S.A. was the Gemalto entity responsible for requesting and assigning UIM_ID codes for all of the Gemalto companies, including Gemalto Pte Ltd.

Gemalto N.V., through its various subsidiaries, manufactures mobile device "smart cards," including Removable User Identity Module ("R_UIM") cards. R_UIM cards contain subscriber data, such as billing information and personal data, allowing a user to remove the card and place it into a different telecommunications device, without losing data or requiring the data to be entered again. To operate properly, each R_UIM card must contain a unique identification number. During 2006 and 2007, each R_UIM card included a unique identification number made up of 32 bits, the first 14 of which identified the manufacturer of the card, and the second 18 bits of which identified the individual card.

Defendant TIA is a non-profit trade organization, whose

2

members are telecommunication companies.  The members pay dues,
which cover the TIA's operating expenses.[2]  In 1997, the TIA took
over the administration of Electronic Serial Numbers ("ESNs")
from the Federal Communications Commission.  ESNs are
distinguishable from UIM_IDs in that ESNs refer to the 32-bit
codes that are embedded in the hardware of telecommunications
devices, and UIM_IDs refer to 32-bit codes that are stored in
R_UIM cards, but both ESNs and UIM_IDs are derived from the same
finite pool of numbers.  When UIM_IDs first became available in
2001, the TIA began managing and assigning them to manufacturers.
Any manufacturer could request UIM_IDs from the TIA.

As part of its management duties, the TIA follows the User
Identification Module ID Manufacturer's Code Assignment
Guidelines and Procedures ("Guidelines") developed by an industry
working group known as the 3rd Generation Partnership Project 2.
These Guidelines direct applicants on how to apply for codes from
the TIA and how to use the codes they are assigned.  They also
direct the TIA on how to assign the codes and manage them as a
public resource.  The TIA is obligated to follow the Guidelines
in its role as an administrator of UIM_ID codes.

The Guidelines set out the procedure by which a smart card

---

[2] Although the two named plaintiffs are not members of the
TIA, a United States subsidiary of Gemalto N.V. is a dues-paying
member of the TIA.

manufacturer may obtain UIM_ID codes.  A manufacturer makes a
request or an application for UIM_ID codes through a "Form A,"
which is submitted to the TIA.  The TIA evaluates the Form A and
using a "Form B" either approves the Form A, rejects it, or
requests additional information.  If an application is accepted,
the TIA will also send the requested UIM_ID codes with the Form
B.  Once the codes are sent to the manufacturer, the manufacturer
is required to send back a "Form C" that includes information
about how and when the codes were used by the manufacturer.  The
TIA charges a fee for each block of codes it assigns.

Starting in late 2006 and continuing through 2007, Gemplus
S.A., acting on behalf of all Gemalto entities, requested codes
from the TIA, but did not receive them in the amount of time or
in the total quantity it requested.  At the same time,
plaintiffs' competitors did receive the codes they requested.
Plaintiffs allege that the TIA failed to follow the Guidelines in
making these assignments and failed to manage adequately the
resource of UIM_ID codes as required by the Guidelines.
Plaintiffs also allege that the TIA's failure to fulfill their
orders allowed competitors to siphon off sales of R_UIM cards
from the plaintiffs and that they were injured as a result of the
TIA's actions.

In the Amended Complaint, plaintiffs assert claims of breach
of contract (Count I), negligence (Count II), violation of the
right to fair procedures (Count III), and a statutory conspiracy

claim (Count IV). Plaintiffs seek compensatory damages, punitive damages, treble damages as to Count IV, reasonable attorneys' fees, witness fees, costs, and all other relief deemed proper.

This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000. The parties agree that Virginia law applies in this diversity suit.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a court should accept the evidence of the non-movant, and all justifiable inferences must be drawn in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If the evidence favoring the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be [properly] granted." Id. at 249-50.

### B. Motions for Summary Judgment

The parties have filed cross-motions for summary judgment. Defendant TIA asks the Court to enter summary judgment in its favor on all four counts of the Amended Complaint, arguing that the two named plaintiffs have failed to show that they, not just

5

the Gemalto entities as a whole, experienced any damage as a result of the defendant's actions.  In the alternative, the TIA requests summary judgment on Count I (breach of contract), Count III (right to fair procedures), and Count IV (statutory conspiracy), arguing that plaintiffs have failed to establish various elements of these counts.  In their Motion for Partial Summary Judgment, plaintiffs ask the Court to enter summary judgment as to certain elements of Count I, II, and III of the Amended Complaint.  Because the defendant's Motion for Summary Judgment as to damages applies to all counts of the Amended Complaint, this issue will be discussed first.  Next, each of the four counts will be addressed in turn.

## 1.    Damages

In its Motion for Summary Judgment, the TIA first argues that summary judgment should be granted in its favor because the two named plaintiffs, Gemalto Pte Ltd. and Gemplus S.A., have failed to produce evidence that they were injured by the TIA's actions.  The TIA suggests that it is possible that some Gemalto entity may have lost sales and potential profits as a result of its actions, but contends that plaintiffs have not proved that they were the entities that were damaged.  Plaintiffs respond that both Gemalto Pte Ltd. and Gemplus S.A. were damaged because they had the capacity to make the sales, but were unable to consummate them, and are claiming the loss of present and future sales, not past sales.  In addition, plaintiffs claim that they

6

are alleging damage to their corporate image, goodwill, and reputation. Finally, plaintiffs argue that, at the very least, Gemalto Pte Ltd. and Gemplus S.A. were required to spend time and money to manage the problems that the TIA's actions caused, and, thus, experienced damage. The parties agree that damage is a required element of each of the four counts alleged in the Amended Complaint.

Under Virginia law, a plaintiff must prove the amount and cause of its damages "with reasonable certainty." See Little v. Cooke, 652 S.E.2d 129, 139 (Va. 2007) (quoting Hale v. Fawcett, 202 S.E.2d 923, 925 (Va. 1974)). As such, "speculation and conjecture cannot form the basis of the recovery." Carr v. Citizens Bank & Trust Co., 325 S.E.2d 86, 90 (Va. 1985). Furthermore, "damages based on uncertainties, contingencies, or speculation cannot be recovered." Shepard v. Davis, 574 S.E.2d 514, 524 (Va. 2003).

a.    Lost Sales

Plaintiffs allege that the defendant's failure to provide them with UIM_ID codes in a timely manner caused them to experience a total of $12 million in economic damages. (See Expert Report of Robert Reilly at ¶ 38.) This damage claim is based on alleged lost profits of $1.865 million from potential sales in the first half of 2007 to five customers, EVN Telecom in Vietnam, Hutch-CAT in Thailand, Reliance in India, APBW in

Taiwan, and China Unicom in China.  (See id. Ex. 2.)  Plaintiffs
also estimate that $600,000 in profits were lost from potential
sales to Reliance in the second half of 2007.  (See id. Ex. 3.)
In addition, plaintiffs' expert opined that plaintiffs lost
profits from 2008 forward in potential sales to Reliance that
have a present value of approximately $9.5 million.  (See id. Ex.
4.)

Plaintiffs' claim of damages resulting from lost profits
from potential sales to EVN Telecom, Hutch-CAT, Reliance, APBW,
and China Unicom fail to meet the bar set by Virginia law because
they are entirely speculative.  First, there is no evidence in
the record showing that either of the two named plaintiffs sold
R_UIM cards directly to four of the five customers at issue,
specifically EVN Telecom, Hutch-CAT, Reliance, and China Unicom,
in the past.  The evidence of past sales to the other customer,
APBW, is weak at best.  More significantly, plaintiffs' evidence
that the named plaintiffs would have made the sales that they
claim lost profits from is speculative and based on
contingencies.

i.  Past Sales

Plaintiffs provided no evidence that they made sales in the
past to three of the five customers at issue, EVN Telecom, Hutch-
CAT, and Reliance.  The plaintiffs' 30(b)(6) witnesses were
unable to say whether or not plaintiffs made sales to these

8

entities in the past, and no documentary evidence was provided in support of such sales.  Furthermore, the only evidence of past sales to a fourth customer, China Unicom, were those made through a partially-owned subsidiary of Gemplus S.A. and not made directly by either named plaintiff.  (See Vasnier Dep. 67-68, 72.)

Plaintiffs' proof of past sales to the remaining customer, APBW, comes solely from the testimony and declaration of one witness, Frederic Vasnier, who was Gemalto Pte Ltd.'s Senior Vice President of the Telecom Business Unit Classic Product Line in 2006 and 2007.  Vasnier's deposition testimony was at times questionable,[3] and his testimony as to plaintiffs' relationship with this customer was weak.  In his deposition, Vasnier stated that he did not know whether Gemalto Pte Ltd. made sales to APBW during the relevant time period.  (Vasnier Dep. 120.)  Yet, in his declaration accompanying the plaintiffs' Opposition to defendant's Motion for Summary Judgment, Vasnier declared that he would testify that Gemalto Pte Ltd. sells R_UIMs directly to APBW. (Vasnier Decl. ¶ 16.)  However, Vasnier's statement in his declaration, which was clearly inconsistent with his deposition testimony, is not supported by any documentary evidence, such as

---

[3] For example, at the start of his deposition, Vasnier, plaintiffs' 30(b)(6) witness on corporate structure, was unable to answer whether plaintiff Gemplus S.A. was still in existence as of November 2008.  (Vasnier Dep. 14-15.)

financial records.[4]

Thus, even accepting all inferences in favor of the non-
moving party, there is no evidence of direct sales to four of the
customers, and the evidence of direct sales in the past to APBW
is weak at best.

## ii.  Present and Future Sales

Plaintiffs, however, contend that evidence of past sales is
immaterial because their claim for damages involves present and
future sales, not past sales.  Yet, with scant evidence of
plaintiffs making past sales to the five customers, the claim
that the two named would have made the sales to these customers
in 2007 and beyond, and, thus, actually suffered damage, is
highly speculative.[5]  First, plaintiffs do not rely at all on
their Rule 30(b)(6) witness on damages, as he was apparently not
able to adequately detail the damages to the named plaintiffs
resulting from lost sales.  (See Def.'s Reply, Ex. E; Summ. J.

---

[4] In his declaration, Vasnier states that all sales to APBW
are recorded on Gemalto Pte Ltd.'s financial statements, but that
the TIA never requested financial statements from either
plaintiff.  However, in its First Request to Plaintiffs for
Production of Documents, the TIA requested "[e]ach document
relating to or pertaining to the damages Gemalto allegedly has
incurred as a result of TIA's actions and inactions."  (First
Request to Plaintiffs for Production of Documents ¶ 20.)

[5] The opinions of plaintiffs' expert on damages do not enter
into this analysis because the expert, Robert Reilly, did not
conduct an independent investigation into whether the two named
plaintiffs would actually have made the sales to the five
customers at issue.  (See Robert Reilly Dep. 88-89.)

Hr'g Tr. 22, Feb. 6, 2009; see also Dep. of Praveen Venkataramu 208-10.) Instead, plaintiffs rely on the deposition testimony and declaration of Vasnier, who stated that the named plaintiffs had the ability to make the sales to the five customers and that he could have directed them, among any of the Gemalto subsidiaries, to make the sales. As stated above, however, Vasnier's deposition testimony was puzzling at times. For example, the witness first claimed to have difficulty understanding the word "manufacturing," and, thus was initially unable to answer whether Gemalto Pte Ltd. manufactured R_UIM cards. (See Vasnier Dep. 36-37.) Then, when asked directly if Gemalto Pte Ltd. sells R_UIM cards, he answered, "[t]he sales people of Gemalto PTE Limited of Asia are selling RUIM cards." (Id. at 38-39.) He seemed unwilling to confirm that Gemalto Pte Ltd. did sell R_UIM cards. This enigmatic testimony provides limited support for plaintiffs' claim that they actually had the ability to manufacture and sell R_UIM cards, as Vasnier claims they did.

Moreover, plaintiffs have not presented any evidence of contacts or communication between the named plaintiffs and the five customers at issue to support Vasnier's testimony. Thus, whether Vasnier would have assigned the sales to these two Gemalto entities is mere speculation, at best. Furthermore, there is no evidence that Vasnier had ever made that kind of substitution in the past. (See Summ. J. Hr'g Tr. 21.) Whether

Vasnier would have made that sort of substitution had the TIA
provided all the codes Gemplus S.A. requested is pure
speculation.

Because the Court finds that plaintiffs' claimed damages
based on lost profits from potential sales to the five customers
are purely speculative and not based on any concrete evidence,
defendant TIA has been granted summary judgment as to these
damages.

**b.  Damage to Corporate Image, Goodwill, and Reputation**

Plaintiffs also claim loss to their corporate image,
goodwill, and reputation. As evidence of this loss, Vasnier,
states in his declaration that "the sales that Gemalto Pte Ltd.
managed constituted 100% market share with Reliance" and that the
"sole-supplier relationship was irretrievably lost" as a result
of the TIA's actions. (Vasnier Decl. ¶ 27.) Yet, as detailed
above, there is no evidence in the record that the named
plaintiffs actually made any sales to Reliance in the past, and
the evidence that they would have made sales in 2007 through the
present is speculative. Although some Gemalto entity may have
experienced damage as a result of losing the sole-supplier
relationship with Reliance, there is no evidence that the
plaintiffs in this litigation experienced the loss. For these
reasons, summary judgment has been granted to defendant TIA as to
these damages.

c.   Costs Associated with the "Swat Team"

Finally, the named plaintiffs state that they were damaged when they were forced to spend time and money responding to the shortage of UIM_IDs as a result of the TIA's actions.  Because there is evidence in the record that employees of the named plaintiffs worked as members of the "swat team," the Court is satisfied that these damages are not overly speculative. Accordingly, that portion of defendant's Motion for Summary Judgment has been denied, and this claim for damages may proceed to trial.

2.   Breach of Contract (Count I)

Defendant TIA moves for summary judgment on the breach of contract claim, arguing that plaintiffs have failed to establish that there was a contract between the parties.  Plaintiffs also move for summary judgment, asking the Court to find that they are entitled to summary judgment on the issues of whether a contract existed and whether the TIA breached the contract.

Under Virginia law, the elements of a contract are an offer, an acceptance, and valuable consideration.  See Montagna v. Holiday Inns, Inc., 269 S.E.2d 838, 845 (Va. 1980).  A plaintiff alleging breach of contract must prove "1) a legally enforceable obligation of a defendant to a plaintiff; 2) the defendant's violation or breach of that obligation; and 3) injury or damage to the plaintiff caused by the breach of obligation."  Sunrise

13

Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009)

(quoting Filak v. George, 594 S.E.2d 610, 614 (2004)).

At oral argument, counsel for the plaintiffs attempted to clarify his clients' view of the contract between the parties. Plaintiffs' counsel stated that plaintiffs' theory of contract is as follows:

> MR. HOLLMAN: My theory, Your Honor, is that TIA invites an application according to a form that is part of the guidelines which is called the Form A, and when, when an applicant makes -- submits that application in the proper form according to Form A and in conformance with the guidelines and TIA receives and accepts that application, its promise to the applicant and the industry is that that application will be processed according to the guidelines, and then it invoices on that application, Gemalto pays for the invoice, and the application is supposed to proceed.

> THE COURT: So your view is that once the application is tendered and there's been some acknowledgment that it's been tendered, it's been received and the fee has been tendered, that that creates a contractual relationship between the applicant and the TIA that they will be bound, both sides, by the guidelines.

> MR. HOLLMAN: Yes, Your Honor.

(Summ. J. Hr'g Tr. at 18-19.)[6]

Under Virginia law, an offer "is a manifestation of a

---

[6] The theory of the contract plaintiffs advanced at oral argument appears to vary from the theory of the contract set forth in their summary judgment pleadings.

14

willingness to enter into a bargain." See Chang v. First
Colonial Sav. Bank, 410 S.E.2d 928, 930 (Va. 1991).  "The offer
identifies the bargained for exchange, and creates a power of
acceptance in the offeree."  Id. (internal citations omitted).
However, the Guidelines do not constitute a "bargained for
exchange" between plaintiffs and the TIA.  Cf. Chicago Sch. of
Auto Trans. v. Accred. Alliance, 447 F.3d 477, 449 (7th Cir.
1994) (finding that rules and bylaws developed by an accrediting
agency did not form a contract between the agency and a school
seeking a renewal of its accreditation).  Instead, the Guidelines
are standards developed by an industry group to govern the
allocation of UIM_ID codes.  This conclusion is supported by the
history and the text of the Guidelines.  The User Identification
Module ID Manufacturer's Code Assignment Guidelines and
Procedures were developed as a "consensus of representatives of
entities within the wireless sector of the telecommunications
industry," and the Guidelines are described as "contain[ing] the
guidelines and procedures for the assignment and use of
[UIM_IDs]."  (Ex. 10, ¶¶ 1.4, 1.7.)  The reality that the
Guidelines do not form the terms of a contract between the
parties is further illustrated by the fact that the industry
group that developed the Guidelines could potentially amend or
otherwise alter the Guidelines without the permission of the
plaintiffs, who are supposedly contracting parties.  (See Ex. 10
¶ 12.0.)  Finally, neither the title of the Guidelines nor its

15

text indicates that the Guidelines were intended to create a contract between the TIA and any manufacturer that might decide to apply for codes through a Form A.

For these reasons, the Court finds that the tendering of a Form A, even coupled with the TIA's acknowledgment of its receipt, does not form a binding contract between the TIA and the manufacturer who submits the Form A because the Guidelines are not an offer on the part of the TIA. Accordingly, summary judgment has been granted in favor of defendant TIA on Count I.

## 3. Negligence (Count II)

Plaintiffs seek summary judgment on Count II only as to the legal issue of whether the TIA owed plaintiffs a duty of reasonable care in its management and distribution of the codes. In its opposition to the plaintiffs' motion, the defendant does not argue that the TIA does not owe plaintiffs a duty of care, but mainly argues that there are material issues of fact that preclude summary judgment on the entire count.

In Virginia, a plaintiff alleging negligence must "show the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage." See McGuire v. Hodges, 639 S.E.2d 284, 288 (Va. 2007) (citing Atrium Unit Owners Ass'n v. King, 585 S.E.2d 545, 548 (Va. 2003)). Whether a legal duty exists is a question of law for the court. See Yuzefovsky v. St. John's Wood Apartments, 540 S.E.2d 134, 139 (Va. 2001). Thus,

16

the issue of whether the TIA owed a duty of reasonable care to plaintiffs is appropriate for resolution at this time.

When determining whether a duty exists as to a particular plaintiff, a court considers factors including "1) the foreseeability of harm, 2) the likelihood of injury, 3) the magnitude of the burden of guarding against the injury, and 4) the consequences of placing such a burden on the defendant." Jappell v. Am. Ass'n of Blood Banks, 162 F. Supp. 2d 476, 480 (E.D. Va. 2001). In 2001, the TIA accepted the responsibility of managing and assigning UIM_ID codes for an entire industry. There is no question that these codes are valuable to smart card manufacturers. In fact, the codes are so important to members of the industry that a committee developed Guidelines and Procedures to advise on how to administer the codes. Therefore, it was foreseeable that mismanagement of either the assignment or the reclamation of the codes would harm the manufacturers who applied for codes. In addition, the likelihood of harm was high given the uniqueness of each UIM_ID needed to make each R_UIM card and the finite universe of available 32-bit codes, thereby making management of both the individual codes and the universe of codes crucial to manufacturers.[7] Finally, the TIA accepted the responsibility to administer the codes, and in accepting that

---

[7] Because of the shortage of ESNs and UIM_IDs, manufacturers are now moving toward using expanded UIM_IDs ("E-UIM_IDs"). One source of E-UIM_IDs is MEIDs, which contain a 56-bit number.

responsibility, accepted a duty to act reasonably when it was administering and managing the codes. Because the TIA does have a duty of care to manufacturers who applied for UIM_ID codes, that portion of plaintiffs' Motion for Partial Summary Judgment has been granted. However, the negligence claim, Count II, will have to be tried because there are material issues of fact in dispute.

## 4. Breach of Right to Fair Procedures (Count III)

Defendant TIA moves for summary judgment on Count III, arguing that plaintiffs have failed to allege a cause of action for breach of the common law right to fair procedures because they cannot establish that they lost their membership in an organization and have not shown that the TIA acted in bad faith. Additionally, the defendant contends that Virginia law provides injunctive relief as the only remedy for the breach of the right to fair procedures, and that plaintiffs are only seeking monetary damages. Plaintiffs also move for summary judgment on this count, claiming that the TIA, as a voluntary association, was obligated to provide fair procedures to manufacturers when they distributed the codes and that it failed to do so. Plaintiffs further argue that Virginia law does allow for compensatory damages for violations of the right to fair procedures, and, in any case, they seek all relief possible, including injunctive relief.

18

Although plaintiffs claim that under Virginia law,
"voluntary associations like TIA owe those directly impacted by
their decisions due process and fair procedures," Virginia courts
have not yet adopted such an expansive approach to the common law
right to fair procedures.  In Gottlieb v. Economy Stores, Inc.,
102 S.E.2d 345 (1958), the Virginia Supreme Court recognized a
common law right to fair procedures in a case in which the
defendant expelled the plaintiff from membership in its
corporation of grocery store owners for misconduct.  See id. at
350.  In reviewing whether the plaintiff's rights were violated
by the corporation, the Virginia Supreme Court observed:

> In reviewing an action expelling a member of a
> corporation, [the courts] may inquire whether the
> member was given reasonable notice of the hearing of
> the charge against him, whether he was afforded an
> opportunity to be heard, and whether the hearing and
> expulsion were in good faith.

Id. at 352.  In Gottlieb, the Court concluded that the plaintiff
had been accorded fair procedures.  Id. at 353.

Plaintiffs have not cited a Virginia case extending the
right of fair procedures to cover all those "directly impacted"
by the decisions of a voluntary organization.  Moreover, the
Fourth Circuit opinion in National Foundation for Cancer Research
v. Council of Better Business Bureau, Inc., 705 F.2d 98 (4th Cir.
1983), does not support the plaintiffs' expansive view of the
law.  There, the plaintiff alleged that the defendant wronged it
by issuing a critical report of its practices.  705 F.2d at 99.

19

In its fair procedures claim, the plaintiff argued that the defendant "owe[d] a duty to the charities it evaluates to apply its standards fairly and reasonably" because it had a "substantial effect on the economic viability of charitable organizations by its promulgation of certain standards and its reporting of compliance, or lack of compliance, with these standards to potential donors." Id. Both the district court and the appellate court rejected the claim as unsupported by Virginia law. Id. The Fourth Circuit observed that the cases cited by the parties recognized a breach of the duty of fairness where the private association could "by excluding an entity from membership or by refusing to recognize or certify an entity, deny a virtual pre-requisite to the practice of a profession or the operation of a business." Id. at 100. The Court concluded, based on the non-Virginia cases and the lack of similar Virginia precedent, that it was unlikely that the Virginia Supreme Court would recognize such an extension of the common law duty of fairness to the facts of that case. Id.

The facts of this case do not involve either set of facts that the National Foundation court recognized as generally giving rise to a common law duty of fair procedures. The TIA was not excluding the plaintiffs from membership in the organization or refusing to recognize or certify the plaintiffs. See id. On these facts, the Court finds that the TIA did not owe plaintiffs a right to fair procedures, and, thus, summary judgment in favor

20

of defendant TIA has been granted as to Count III. It is therefore unnecessary for the Court to address the TIA's other arguments.

## 5. Statutory Conspiracy (Count IV)

The TIA moves for summary judgment on Count IV, arguing that plaintiffs cannot establish that it conspired with third parties or that it acted with malice. To prove a statutory business conspiracy claim in Virginia, a plaintiff must prove that two or more persons combined, associated, agreed, or mutually undertook together to willfully and maliciously injure another in his reputation, trade, business, or profession. See Va. Code Ann. § 18.2-499 (2004); T.G. Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC, 385 F.3d 836, 845 (4th Cir. 2004). Accordingly, the elements of a business conspiracy are 1) a concerted act, 2) legal malice, and 3) a causally-related injury. Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 144 F. Supp. 2d 558, 601 (W.D. Va. 2001).

Plaintiffs' theory of the conspiracy is that the TIA conspired with regional administrators in China and Japan to injure them. (Plfs.' Br. in Opp. 28, 29.) Plaintiffs admit that they have no direct evidence of an agreement to injure the plaintiffs (see id.; Summ. J. Hr'g Tr. 30-32), but argue that a conspiracy may be inferred because the TIA allocated codes in a way that "favored small UIM_ID applicants over large ones like Gemalto." (Plfs.' Br. in Opp. 28.) Plaintiffs also suggest that

21

the Court might infer that the TIA was trying to conceal the conspiracy because its expert was not aware that codes were being distributed through the regional administrators. Yet, even when viewed in the light most favorable to plaintiffs, the evidence simply does not support "an inference" that the TIA and the regional administrators were acting together in order to injure Gemalto Pte Ltd. or Gemplus S.A. Clearly, the plaintiffs did not agree with the way the TIA decided to allocate codes during the shortage, but these facts do not amount to a conspiracy to injure them. Moreover, plaintiffs have not provided any motivation, financial or otherwise, for why the TIA might want to injure the plaintiffs, and there is not a scintilla of evidence in this record to find malice. Accordingly, defendant TIA has been granted summary judgment on Count IV of the Amended Complaint.

## III. Conclusion

Summary judgment has been granted in favor of defendant TIA in all respects, except as to damages experienced by plaintiffs in connection with their efforts to manage the response to the shortage of UIM_ID codes. Summary judgment was granted in favor of plaintiffs on an element of Count II and denied as to Counts I and III. This civil action will proceed to trial only on Count II of the Amended Complaint, with the only damage issue being the plaintiffs' expenses in connection with their efforts to manage the response to the shortage of UIM_ID codes.

A separate order consistent with this Memorandum Opinion was issued on February 20, 2009.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

Entered this 24th day of February, 2009.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge